Maurice W. Lipscher v. Commissioner. Irwin I. Kretzer and Rose Kretzer v. Commissioner.
Lipscher v. Commissioner
Docket Nos. 65795, 65796.
United States Tax Court
T.C. Memo 1960-60; 1960 Tax Ct. Memo LEXIS 223; 19 T.C.M. (CCH) 318; T.C.M. (RIA) 60060; March 31, 1960
*223 Maurice W. Lipscher, pro se, 1530 Fifth Avenue, Youngstown, Ohio, and for Irwin I. and Rose Kretzer. John P. Graham, Esq., and Frank W. Hardy, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined the following deficiencies in income tax and additions to tax for substantial underestimation of estimated tax: Additions to Tax
Sec. 294(d)(2)
Petitioners
Year
Deficiencies
I.R.C. 1939
Maurice W. Lipscher
1953
$1,559.21
$129.45
Irwin I. Kretzer and Rose Kretzer
1953
1,017.74
162.57
The issues are: 1. Are petitioners' distributive shares of a profit from the sale of a 21-acre tract of land, realized in 1953 by a partnership doing business under the name of United Realty Company, of which they were members, taxable to them as long-term capital gain or as ordinary income? 2. Did petitioner Maurice W. Lipscher realize long-term capital gain or ordinary income from the sale by him in 1953 of a house and lot in Masury, Ohio? Petitioners concede that their distributive shares of the profit realized by United Realty Company in 1953 from sales of property, with the exception of the foregoing 21-acre tract, are taxable as ordinary income. In determining the deficiencies, *224 respondent made some adjustments to the net income reported by petitioners in their returns other than those contested or conceded by petitioners. Although they alleged error with respect to two of these adjustments, they have introduced no evidence and advanced no arguments as to them, and it must, therefore, be assumed that they are not contesting them. Findings of Fact Some of the facts have been stipulated and, as stipulated, they are incorporated herein by reference. Petitioners, residents of Youngstown, Ohio, filed their income tax returns for the year 1953 with the district director of internal revenue, Cleveland, Ohio. Petitioners, Irwin I. and Rose Kretzer, husband and wife, filed a joint return. Petitioners Maurice W. Lipscher and Irwin I. Kretzer are lawyers engaged in the general practice of the law in Youngstown. Maurice Hoffman is engaged in the grocery business. In 1951, these three men agreed to enter into a joint venture to engage in deals relating to real estate involving purchases, sales, or other transactions that might appear to have some hope of profit. On October 27, 1951 they entered into a partnership agreement which provided, in part, that they would engage *225 in a joint venture under the name of United Realty Company (hereinafter referred to as United), that the purpose of the joint venture was to hold and manage any real property acquired, and sell the same; that the capital of the partnership would be contributed equally by its members; that they would share equally any net profits realized, or losses sustained, by the partnership; and that the partnership would be dissolved when all properties were "developed, sold and the profits distributed". Lipscher did most of the legal work required in connection with the business of United. Hoffman, who personally owned a large amount of property in Youngstown and knew more about real estate than the other members of the partnership, handled purchases and sales of property for United. United filed a partnership return for the year 1953 with the district director of internal revenue, Cleveland, Ohio, in which it described the business activity of the partnership as "Rentals-Sale of Real Estate". In that return it reported gross rental income for 1953 from five houses of $1,747.50, deductions for expenses of $2,322.51, and a net rental loss of $575.01. The expenses claimed include among other items *226 the following: Office - $181.04, Advertising - $100.32, Maintenance - $610.49, Depreciation - $471.50. In "Schedule E - Depreciation" depreciation was taken on one frame building and one house, both acquired in 1952, and on three houses acquired during 1953. The partnership purchased five houses in 1952 and sold two houses in 1953. In the partnership return of United for 1953 $1,036.80 was reported as long-term capital gain on three installment sales of real estate. There were also reported in the return nine other sales of real estate, the gross sales of these parcels being reported as $23,800, total costs $8,578, commissions paid $1,562.50, and net long-term capital gain $13,659.50. The reported net gain received from all twelve sales amounted to $14,696.30, and the partners' distributive shares $4,898.76, $4,898.77 and $4,898.77. No dates of purchases or of sales or any information as to holding periods for the twelve properties sold are shown in the return. In their individual income tax returns for 1953, Lipscher and Kretzer reported their distributive shares of the net profit reported by the partnership on the twelve sales as long-term capital gain. Respondent determined that *227 their distributive shares of this profit were taxable as ordinary income. The Mahoning County deed records on June 4, 1954, reflected the following information from real estate deeds of record involving United as grantor or grantee: 10-27-51
1-1-52
1-1-53
1-1-54
to
to
to
to
Period
12-31-51
12-31-52
12-31-53
6-4-54
No. of Purchase Transactions **
4
20
8
13
No. of Sales Transactions
7
10
7
No. of Lots Purchased
4
56
14
37
No. of Lots Sold
7
19
8
No. of Outlots and other acreage parcels
purchased
1
4
2
No. of Outlots and other acreage parcels
sold
2
3
Gross Amount of Purchases [1] *228 $2,565.00
$25,202.03
$16,445.00
$21,566.00 Of the forty-five separate purchases by United of record in the county deed records on June 4, 1954, forty were by delinquent tax sale deeds from the sheriff, and one by deed from the United States Marshal. One of the installment sales and four of the other sales reported in the partnership return of United for 1953 do not appear to be reflected by deeds of record from United in the Mahoning County deed records on June 4, 1954. United continued to purchase real estate through the year 1955 and continued to sell real estate after 1955. In 1952 United purchased Outlot No. 698, a 21-acre tract, at a tax sale for $5,552. In making this purchase the intention of the partners was to realize the most profit possible from the property. The property had at one time been used for mining sand; but its use for that purpose had been abandoned by the prior owner. Among the possible uses of the property, in addition to reactivating the sand mining operations, were construction of low cost housing or the construction of a shopping center. Each one of these three uses involved outlays of capital substantially *229 in excess of what the purchasers were willing or able to make available, and no serious efforts were made by the purchasers looking towards the utilization of the property for any of these three possible purposes. In 1953, in response to an inquiry made by a real estate agent, the partners agreed to sell the 21-acre tract for $16,000 with the understanding that the agent would receive a commission of $1,000 for negotiating the sale. On July 15, 1953, United granted the agent an option to purchase the tract for $16,000. On September 15, 1953, the property was transferred by deed from United to John Cafaro (the undisclosed principal for whom the agent had taken the option) for $16,000, $1,000 of which was paid to the real estate agent as commission. The tract was held by United for thirteen and one-half months. The sale of this property was one of the 12 sales reported in the partnership return of United for 1953. United did not employ anyone to manage the properties owned by it. It never employed any real estate agents on a permanent basis to sell property for it. It had no separate office, no employees, and was not listed in any telephone book. It never constructed any houses and never *230 made any improvements on any parcels or lots owned by it. Sales of its properties were unsolicited and were usually made to persons in the neighborhood, or others, who heard about the properties. Lipscher purchased in his own name a lot in Masury, Ohio, near Youngstown, on May 7, 1952, and he purchased a house in the same locality through a State Highway Department auction at about the same time. These purchases were made with the intention of moving the house to the lot. The house was moved to the lot and the total cost of the resulting parcel of property was $6,182.56. The house and lot were sold by Lipscher in 1953 for $7,000. He held the lot over 16 months from the date of purchase. In his income tax return for 1953 he reported the net profit from the sale of his Masury property as long-term capital gain. Respondent determined that it constituted ordinary income. In his income tax return for 1953, Lipscher, in addition to reporting the gain from the sale of the Masury property and his share of the net gain realized by United, reported his share of the gain of $1,345.70 realized from a sale of property by a joint venture composed of himself and Nate Moyer. Also reported in that *231 return was income from dividends of $2,513.88, and his income from occupation of "Law - Adjuster" consisting of gross receipts of $13,544.26, less business expenses of $7,896.58, and resulting net income of $5,647.68. He did not claim depreciation on any rental property individually owned and did not report any receipts of rental income from such property during 1953. In the joint income tax return of Irwin I. and Rose Kretzer for 1953, there were reported, in addition to Kretzer's share of the net gain realized by United, Kretzer's shares of gains realized from sales of property by Mahoning Realty Company and Youngstown Realty Company, partnerships of which Kretzer was a member, and a gain realized on a sale of property by Rose Kretzer. Also reported in this return were dividends of $23.38, interest $682.66, net rental income $2,729.55, net proceeds from sales of unidentified real estate (less advertising) $133.88, and Kretzer's income from practice of law consisting of gross income of $11,551.44, less business expenses of $2,231.49. During the year 1953, and prior thereto, Kretzer was a member of three joint ventures, other than United, which operated under the names of Youngstown *232 Realty Company, Mahoning Realty Company, and H.K.S. Company. Youngstown and Mahoning engaged in the purchase and sale of a small number of lots or parcels of real estate. H.K.S. Company at some undisclosed time purchased two buildings, which it rents and has not sold. During the year 1953, Lipscher had an interest in six real estate ventures, other than United, which operated under the names of Fundamental Land Company, Associated Holding Company, Imperial Realty Company, Homer Land Company, Pioneer Land Company, and Pixie Land Company. Fundamental Land Company in which Lipscher was a partner purchased six lots in one purchase on February 4, 1953, and sold these six lots in six different sales transactions during the period June 29, 1953 to March 22, 1955. Associated Holding Company in which Lipscher was a partner purchased a pottery factory and thirteen lots at a receivers' sale on September 25, 1952 for $19,000 and this property was subsequently sold. Associated Holding Company purchased 85 lots in one purchase at a tax sale on February 18, 1953 for $5,290.03 and sold two of these lots in one sales transaction on March 25, 1953 and sold four of these lots in another sales transaction *233 on September 26, 1953. The remaining lots were sold to Kretzer on March 25, 1955. Imperial Realty Company in which Lipscher had an interest purchased one lot on June 3, 1952, for the sum of $30,000 and sold this property on February 3, 1953 for an unspecified amount but by deed with $40.70 in Revenue Stamps attached. Pixie Land Company, which was owned by Lipscher, purchased two lots on April 25, 1952, and sold these lots on August 11, 1953. Homer Land Company, in which Lipscher had an interest, purchased seven lots at a tax sale in September 1953, and sold six of these lots in five sales transactions during the interval November 30, 1953 to March 22, 1955. Pioneer Land Company, which was owned by Lipscher, purchased four lots in one purchase from a receiver on May 21, 1953 and purchased more lots in 1954. Pioneer sold six lots in the interval June 3, 1954 to January 24, 1955, by three separate sales to Oxford Land Company. In addition to the foregoing, Lipscher was a member, subsequent to 1953, of the following joint ventures engaged in real estate activities: Oxford Land Company, Midwest Land Company, Martha Land Company, Inland Company, Independent Investment Company, Atlantic Investment *234 Company, Security Investment Company, Sunshine Company, and Fleck-Lipscher. United was in the business of buying and selling real estate for profit during 1953. The 21-acre tract, Outlot No. 698, was held by it during that year primarily for sale to customers in the ordinary course of its business. Lipscher purchased and held the Masury, Ohio, property in 1953 primarily for sale to customers in the ordinary course of his business activities of buying and selling real estate for profit. Opinion RAUM, Judge: 1. Respondent determined that all gains realized by United from sales of real estate in 1953 were taxable as ordinary income. Petitioners concede the correctness of this determination with respect to all properties sold except the 21-acre tract, Outlot No. 698. They contend that this property was a capital asset acquired for investment purposes, and was not property held by United primarily for sale to customers in the ordinary course of its business. Section 117(a)(1)(A), Internal Revenue Code of 1939. We think that petitioners have not carried their burden of proof. Petitioners attempted to show or suggest that one or more of them contemplated using this property in a sand business, *235 or developing it for low cost rental housing, or building a shopping center upon it. Although it may well be that petitioners may have recognized that the property was susceptible of use for the foregoing purposes, we have no convincing evidence that they or United ever intended to exploit the property along such lines. The capital required for such exploitation appears, on this record, to have been beyond the reach of United or its constituent partners, and we do not believe that any of them seriously intended to develop the property for any of the foregoing purposes. Of course, such potential uses enhanced the likelihood of a profit upon sale, and so far as this record shows, United held this property for disposition at a profit along with other parcels of real estate which it bought and sold. Although United held a few pieces of rental property and realized a small amount of rent from such property, the rentals appear to be only incidental to its primary function which was to purchase lots and parcels of real estate in quantities at tax sales and sell them whenever a satisfactory profit could be made. That the sale of real estate was a prominent function is indicated by the description *236 of its business as "Rentals - Sale of Real Estate" in its return for 1953, the statement in the partnership agreement that the purpose of the joint venture was "holding and managing of such real property as may be acquired; and selling the same"; the large number of lots and parcels of real estate purchased primarily at tax sales; its failure to make improvements on any of these lots or parcels; and the frequent sales made by it of lots at a profit. Although it appears that United did not engage in any promotional sales activities, such as advertising or listing its properties with real estate brokers, we are convinced that it was nevertheless engaged in the business of buying and selling undeveloped real estate. The 21-acre tract, Outlot No. 698, differed from other lots sold during 1953 only in that it was held for a longer period. After a careful consideration of all of the evidence, our conclusion is, and we have found as a fact, that this parcel was held by United primarily for sale to customers in the ordinary course of its business of buying and selling real estate for profit. Respondent did not err, therefore, in determining that petitioners' distributive shares of the gain *237 realized on its sale in 1953 were taxable as ordinary income. 2. There remains the question whether the gain realized by petitioner Lipscher from the sale of a house and lot in Masury, Ohio, is taxable as ordinary income or long-term capital gain. The evidence discloses that during 1953 Lipscher participated in seven separate ventures which were engaged in the purchase and sale of real estate. In some of these ventures, such as United, his participation was as a partner. In others, such as the Pioneer Land Company and the Pixie Land Company, he was the sole owner. All of these ventures engaged in the purchase and sale of real estate. In addition, after the year 1953, Lipscher was part of at least nine other ventures or partnerships in real estate operations. Although such activities after 1953 do not strictly prove that he was in the business of buying and selling real estate during 1953, they do show a continuing pattern of activity along these lines. We think that on this record Lipscher was engaged in the business of buying and selling real estate through his various ventures and partnerships; certainly he has not shown the contrary, and the burden was upon him. Lipscher urges that *238 his purpose in purchasing the lot in Masury and moving a house onto the property was to hold the house and lot for rental and not for resale. But there is no evidence that the house was ever rented or offered for rent during the period he held it. We cannot find on this record that he has sustained his burden of proving that the house and lot were not held by him primarily for sale to customers in the ordinary course of his business of buying and selling real estate. In the circumstances respondent's determination that the gain realized on the sale was taxable as ordinary income must be approved. Decision will be entered for the respondent. Footnotes
*. The earliest deed of purchase is dated October 27, 1951. The 1951 purchases include one purchase involving two lots for which a correction deed was subsequently issued to United on April 8, 1952. This correction deed is excluded from the figures shown for 1952 purchases. The figures shown for 1953 purchases exclude duplicate deeds to United involving twenty-one lots, already purchased in 1952. ↩
1. The gross amount of purchases in 1953 omit two purchases for unspecified considerations for which the respective deeds bear Revenue Stamps in the amounts of $4.95 and $3.30. The gross amount of purchases in 1954 omits one purchase for unspecified consideration for which the deed bears Revenue Stamps in the amount of $0.55.